UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

Sandra J. Oglesby and Donald
Oglesby,

                                      Plaintiffs,

      -v.-                                              1:07-CV-00051
                                                            (NPM-RFT)

Holly Eikszta, individually; Lisa Wiles,
individually; Nancy Sharoff, individually;
Victoria Leland, individually; Theresa
Sheely, individually; Sherry Sharpe,
individually; Tashia Brown, individually;
and the Ellenville Central School District,
New York,

                                        Defendants.

---

APPEARANCES:                                OF COUNSEL:

Attorneys for Plaintiffs:

LOVETT & BELLANTONI, LLP        JONATHAN LOVETT, ESQ.
37A Saw Mill River Road
Hawthorne, NY 10532

Attorneys for Defendants:

TARSHIS, CATANIA, LIBERTH,
 MAHON & MILLIGRAM, PLLC       RICHARD F. LIBERTH, ESQ.
One Corwin Court
P.O. Box 1479
Newburgh, NY 12550

Neal P. McCurn, Senior District Judge

## *MEMORANDUM-DECISION and ORDER*

### *I. Introduction*

Presently before the court in this civil rights action is a motion for summary judgment by defendants against plaintiffs. The plaintiffs are Sandra J. and Donald Oglesby ("Plaintiffs" or "the Oglesbys"). Plaintiffs are the adoptive parents of twin girls, IG and NR ("the twins"), and the biological parents of one boy, ID, all of whom have been enrolled as students in the Ellenville Central School District ("the School District"). The Oglesbys seek relief from the defendants in this case for injuries allegedly suffered as a result of defendants' alleged malicious and false report of child abuse against Plaintiffs to the Child Protective Service in Kingston, New York. Defendants are the School District and several of its employees, sued in their individual capacities ("the individual defendants"): Holly Eikszta ("Eikszta"), principal of Ellenville Elementary School ("the elementary school"); Lisa Wiles ("Wiles), superintendent of the School District; Nancy Sharoff ("Sharoff"), ID's former teacher; Victoria Leland ("Leland"), school nurse at the elementary school; Theresa Sheely ("Sheely"), school psychologist at the elementary school; Sherry Sharpe ("Sharpe"), Director of Special Education for the School District during the relevant time; and Tashia Brown ("Brown"), assistant principal of the elementary school during the relevant time. Plaintiffs oppose the pending motion, and Defendants reply. Decision is rendered on the papers submitted without oral argument.

### *II. Factual Background*

The following facts are undisputed except where noted.

In August 2002, Plaintiffs became the pre-adoptive parents of IG and NR as well as their two biological brothers. At that time, the twins were four years old

2

and their brothers were ages six and eight. The Oglesbys' biological son, ID, was six years old at the time. Due to inappropriate sexual conduct between the twins and their biological brothers, one incident of which was witnessed by ID, the twins' biological brothers were removed from Plaintiffs' home and adopted by other families. The following August, Plaintiffs became the adoptive parents of IG and NR.

At some point after the twins' biological brothers were removed from Plaintiffs' home but before the twins started kindergarten, the Plaintiffs observed the twins interacting with each other in a sexually inappropriate manner. Thereafter, Plaintiffs engaged the twins in therapy, during which the twins conveyed a history of sexual abuse, experienced in both their biological and previous foster homes. According to Plaintiffs, as a result of the alleged prior sexual abuse, both IG and NR are "triggered" by certain objects which cause them to have "urges" to engage in sexually inappropriate behaviors, such as masturbation. However, while both IG and NR have reported incidents of being triggered and having the urge to masturbate, Plaintiffs have only witnessed IG engaged in masturbation activities.

In order to monitor the activities of IG and NR, Mr. Oglesby installed video cameras in Plaintiffs' home. Plaintiffs communicated this information directly to Eikszta. According to Mrs. Oglesby, the cameras were installed at the recommendation of staff at New York Presbyterian Hospital in order to keep the children safe, but the only conduct observed as a result of the surveillance was NR biting her toenails.

When IG was in kindergarten, an issue arose involving her being triggered in an inappropriate sexual manner by a rug upon which students sat during reading

time. Plaintiffs addressed their concern in this regard to Eikszta and IG's teacher. Plaintiffs provided a special pillow for IG to sit on during reading time, which resolved the issue and IG successfully completed kindergarten. Plaintiffs also admit that in the first grade, IG's conduct was inappropriate at times but within normal limits for a child her age. Therefore, Plaintiffs admit, during first grade IG developed into an "A" student, both socially and academically.

Plaintiffs both admit that in the second grade, IG's condition began to deteriorate markedly. In November 2005, while a second grade student, IG inserted a camp trophy and a caulking gun into her vagina, injuring herself and causing bleeding. Plaintiffs took IG to her family doctor, who noted that IG needed to be hospitalized. IG was thereafter hospitalized at New York Presbyterian Hospital for approximately four weeks. The hospitalization was reported to the School District. In January 2006, IG returned to the elementary school. At that time, certain recommendations were made to address safety concerns for IG while at school, especially while using the bathroom. Plaintiffs expressed concerns to various employees of the School District that IG was taking items into the bathroom and using them to masturbate. To resolve this issue, a protocol was established whereby IG was to be asked, prior to using the bathroom, to empty her pockets to ensure that she was not taking any items in with her. Mrs. Oglesby discussed this protocol with Eikszta, Sheely (school psychologist), and Leland (school nurse).

Also, Mrs. Oglesby testified that at some point after the time of IG's hospitalization, she communicated to Leland that on occasion she was examining IG's and NR's vaginas to see if they had injured themselves. Sheely testified that Mrs. Oglesby told her she had inspected IG's vagina at one point and discovered it

4

was red.

During the first week IG was back at school, she reported to Mrs. Oglesby that there was something long and sharp in Leland's bathroom that was causing her upset. Mrs. Oglesby repeatedly contacted Leland, Eikszta and Sheely regarding this issue. Sometime in late March or early April 2006, after receiving no response to her inquiries, Mrs. Oglesby went to the school and looked at the bathroom to determine what was bothering IG. While in the bathroom located in Leland's office, Mrs. Oglesby was accompanied by IG and the school security guard, George E. Barthel. IG pointed out a long metal spigot and told Mrs. Oglesby that she had been using it to masturbate. Mrs. Oglesby expressed her concern to Mr. Barthel that IG was self-mutilating, and Mr. Barthel responded that he should not be privy to such information.

Leading up to April 24, 2006, Mrs. Oglesby had a number of meetings with Leland, Eikszta and Sheely, among others, about the metal spigot and the obsessive compulsive nature of IG's problems. On April 18, 2006, Plaintiffs met with superintendent Wiles and discussed the danger presented to IG by reason of the metal spigot and the School District and Leland's refusal to either closely monitor or supervise IG while in the bathroom.

Also at some point leading up to April 24, 2006, the Oglesbys and their children went on vacation. Thereafter, an issue arose regarding a quiz that Sharoff, ID's teacher at the time, required ID to take upon his return to school. On April 20, 2006, Mrs. Oglesby sent a written complaint to Sharoff, expressing concern that ID was not provided with the materials necessary to succeed on the quiz and criticizing Sharoff for her alleged abusive treatment of students in her class, including ID.

Prior to April 24, 2006, Plaintiffs, or either of them, discussed sexual issues regarding IG and NR with one or more of defendants Eikszta, Wiles, Sheely and/or Leland, including: the sexual abuse it is believed IG and NR were exposed to; the frequent masturbation by IG; Mrs. Oglesby's examination of IG's and NR's vaginas; concerns regarding IG's self mutilating; the spigot and water faucet as examples of triggers; and the use of video cameras in the home to monitor IG's and NR's behaviors.

According to Mrs. Oglesby, on the morning of April 24, 2006, she once again communicated to Wiles and Eikszta, among others, Plaintiffs' demand that IG be afforded a safe bathroom environment and that a monitor be provided for IG when she used Leland's bathroom in order to ensure that she did not take sharp objects for insertion with her or use the spigot. Later that day, a report was made by telephone to the New York State Office of Children and Family Services, Child Protective Services Unit ("CPS") regarding Plaintiffs. As recorded by CPS[1], the "call narrative" is as follows:

> There is concern for the emotional welfare of both I[G] and N[R]. The adoptive parents are preoccupied with discussing sexual issues of the two children with anyone who will listen. They discuss how the children were horribly sexually abused while in their biological parent's care in Texas and in foster care. The Oglesby[]s had adopted four children from the biological family, but have systematically rid themselves of two children and

---

[1] According to CPS regulations, "[w]hen oral reports are made initially to the local child protective service, the child protective service shall immediately make an oral or electronic report to the statewide central register." N.Y. COMP. CODES. R. & REGS. tit. 18 § 432.2 (2011). See also N.Y. SOC. SERV. LAW § 415 (McKinney 2009); Ex. U to Aff. of Richard Liberth, Sept. 30, 2009, Dkt. No. 75.

6

> are now working on the last two, that being I[G] and
> N[R]. The Oglesby[]s discuss how the girls masturbate
> and the inappropriate style and settings of one versus the
> other. They discuss the items the girls masturbate on
> including water spigots and sinks. They have examined
> the girls themselves and claim that one of the twins'
> vaginas is very red inside. The parents claim that the
> girls are sitting on special rugs and pillows and
> excessively masturbating. They have requested that the
> [school nurse] supervise the sexual acting out of the
> children closer. It is believed that the parents might have
> installed special cameras to actually monitor the girls[']
> behaviors. It is unknown if the parents are doing this for
> sexual gratification, but Munchausen[']s cannot be ruled
> out.

After an investigation, which included interviews with ID, NR and IG as well as both Mr. and Mrs. Oglesby, CPS informed Plaintiffs that the complaint against them was deemed unfounded and the case was closed. According to Mr. Oglesby's deposition testimony, after the CPS report was made, there was no loss of custody of IG or NR. See Dep. of Donald B. Oglesby, Aug. 24, 2009, 37:21-23, at Ex. E to Aff. of Richard Liberth, Sept. 30, 2009, Dkt. No. 75.

On September 15, 2006, Plaintiffs filed a Notice of Claim against defendants based on the CPS complaint. Ostensibly sometime thereafter, Sharpe, as Director of Special Education for the School District, complied with a recommendation from New York Presbyterian Hospital that IG have an occupational therapy ("OT") evaluation. Mrs. Oglesby supported that recommendation, but requested that the evaluation be performed by someone other than BOCES staff. Sharpe accommodated that request and set up a private evaluation through an agency called Inspire. Without the knowledge of Sharpe or the School District, the

7

evaluator from Inspire conducted the OT evaluation of IG outside the presence of Plaintiffs.

Plaintiffs assert that Eikszta, Wiles, Sheely and Leland made the report to CPS, which Plaintiffs allege is false. See Pls.' Statement of Material Facts, at ¶ 11, Dkt. No. 78. Each of those defendants, by affidavit, swear that they "have never divulged or [used] the information conveyed to [them] . . . regarding the history or behavior of either IG or NR in a malicious or willfully negligent manner with the intent to cause harm to anyone in the Oglesby family." Aff. of Holly Eikszta, Sept. 29, 2009, ¶ 6, at Ex. G to Liberth Aff.; Aff. of Lisa Wiles, Sept. 29, 2006 ¶ 4, at Ex. I to Liberth Aff.; Aff. of Victoria Leland, Sept. 30, 2009, ¶ 7, at Ex. M to Liberth Aff.; Aff. of Theresa Sheely, Sept. 29, 2009, ¶ 6, at Ex. O to Liberth Aff.

### *III.  Discussion*

Currently pending are two causes of action pursuant to 42 U.S.C. § 1983, predicated on Plaintiffs' claim for violation of their right to intimate association as well as a First Amendment retaliation claim. Both claims are asserted against the individual defendants as well as the School District. Defendants seek summary judgment as to both claims.

#### *A.  Legal Standard*

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial burden to show the court why it is entitled to summary judgment. See Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)). If the movant meets its burden, the burden shifts to the non-movant to identify evidence in the record that creates a genuine

issue of material fact.  See id., at 273 (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348 (1986)).

When deciding whether a material issue of fact is in dispute, the court is cognizant that "[a] fact is material when it might affect the outcome of the suit under governing law." Tracy v. Freshwater, 623 F.3d 90, 95 (2d Cir. 2010) (internal citation omitted).  Also, a material fact is genuinely in dispute "if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Bessemer Trust Co., N.A. v. Branin, 618 F.3d 76, 85 (2d Cir. 2010) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986)).

"In ruling on a motion for summary judgment, the district court may rely on any material that would be admissible or usable at trial." Major League Baseball Props., Inc. v. Salvino, Inc.,  542 F.3d 290, 309 (2d Cir. 2008) (internal quotation and citation omitted).  Finally, when the court is deciding a motion for summary judgment, it must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor.  See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598 (1970)).

It should also be noted that, pursuant to Local Rule 7.1(a)(3), the court deems admitted any properly supported statement of material fact that is not specifically controverted by the opposing party.  See N.D.N.Y. R. 7.1(a)(3).  See also Figueroa v. Tri-City Highway Prods., Inc., No. 08-CV-868, 2010 WL 3635247, at *2 (N.D.N.Y. Sept. 10, 2010) (citations omitted).

### *B.  42 U.S.C. § 1983*

In order to establish a claim pursuant to 42 U.S.C. § 1983, a plaintiff must show "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." Velez v. Levy, 401 F.3d 75, 84 (2d Cir. 2005) (quoting Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920 (1980) (internal quotations omitted)). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3, 99 S.Ct. 2689 (1979)).

### *1. Right to Intimate Association*

Defendants argue that they are entitled to summary judgment on Plaintiffs' claim for violation of their right to intimate association. In the amended complaint, Plaintiffs ground this claim in both the First and Fourteenth Amendments. However, when deciding Defendants' motions to dismiss both the original and amended complaint, this court decided that Plaintiffs' claim for violation of their right to intimate association would be analyzed under the legal framework of the substantive due process right found in the Fourteenth Amendment. See Oglesby v. Eikszta, No. 1:07-cv-00051, 2007 WL 1879723, at *10 (N.D.N.Y. June 28, 2007). Specifically, the court noted that cases in the Second Circuit which specifically deal with the right to intimate association vis-a-vis parent-child relationships, do so applying the principles of substantive due process. See Anthony v. City of New York, No. 00-Civ.-4688, 2001 WL 741743, at *12 (S.D.N.Y. July 2, 2001) (aff'd, 339 F.3d 129 (2d Cir. 2003) (quoting Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999) ("Family members have, 'in general terms, a substantive right under the Due Process Clause to remain together without the coercive interference of the

awesome power of the state.'")); Wilkinson v. Russell, 182 F.3d 89, 104 (2d Cir. 1999)).  Therefore, while the parties set forth their arguments regarding the intimate association claim pursuant to both the First and Fourteenth Amendments, in accordance with the aforementioned relevant caselaw, the claim will be analyzed solely under the legal framework of the substantive due process right found in the Fourteenth Amendment.

Defendants argue that Plaintiffs' substantive due process claim must fail because they have failed to establish a loss of custody.  The Second Circuit has held that in order to prevail on a claim for violation of the substantive due process right of familial association, a plaintiff "must demonstrate that [the alleged offending act] was so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection."  Anthony v. City of New York, 339 F.3d 129, 143 (2d Cir. 2003) (quoting Tenenbaum, 193 F.3d at 600) (internal quotations omitted)).  In both Anthony and Tenenbaum, the Second Circuit found that loss of custody for short periods of time does *not* rise to the level of egregiousness necessary for a substantive due process violation, where the purpose of the separation was to ensure the physical well-being of the detained individual, which is a legitimate governmental objective.  See Anthony, 339 F.3d at 143; Tenenbaum, 193 F.3d at 600-601.

More recently, the Court of Appeals for the Second Circuit affirmed summary judgment in favor of a defendant school district wherein it held that the plaintiffs' Fourteenth Amendment substantive due process claim for violation of the right of intimate association could not lie because there was no actual loss of custody.  See Cox v. Warwick Valley Cent. Sch. Dist., — F.3d —, 2011 WL

11

3631971, at *6 (2d Cir. Aug. 17, 2011) (citing Nicholson v. Scoppetta, 344 F.3d 154, 172 (2d Cir.2003); Anthony, 339 F.3d at 143; Tenenbaum, 193 F.3d at 601). There, the court noted, "[i]t is not enough that the government act be incorrect or ill-advised; it must be conscience-shocking," and that "[o]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional." Id. (internal citations and quotations omitted). Further, the court found that "temporary deprivations [of custody] do not result in the parents' wholesale relinquishment of their right to rear their children, so they are not constitutionally outrageous or conscience-shocking." Id. (internal citations and quotations omitted).

In Cox, the defendant school principal called Child and Family Services ("CFS") to report that the parents of one of his students were neglecting their child. As a result, a CFS worker instructed the parents to meet with her and insisted they take their child to the hospital immediately to undergo a psychiatric evaluation or they could lose custody. The parents complied and eventually, the CFS report was deemed unfounded. The parents and child sued the school district and the principal, arguing, among other things, that the defendants violated their substantive due process rights by interfering with the parents' custody of their child. The court found that while the principal's call to CFS and the consequent demands and threats from CFS to the parents "may have been stressful or even infuriating, [] they did not result in even a temporary loss of custody, let alone a 'wholesale relinquishment of rights.'" Id., at *6. Accordingly, because there was no loss in custody in Cox, the court concluded that the defendants' actions could not be deemed constitutionally outrageous or conscience-shocking, and therefore, no substantive due process claim could lie.

12

Here, as in Cox, Plaintiffs do not allege, nor is there any evidence to show, a loss of custody. In fact, Mr. Oglesby admits that there was no loss of custody. It is important to note, however, that the court in Cox went on to also find that no reasonable jury could find the principal's actions to be outrageous or conscience shocking because there, even in the light most favorable to the plaintiffs, nothing in the CFS report was categorically false. See id. at *7. As is explained more fully in the following analysis of Plaintiffs' First Amendment retaliation claim, here, as in Cox, the CPS report is not materially false. Therefore, because Plaintiffs suffered no loss of custody and because the CPS report is not materially false, Plaintiffs are unable to prove that Defendants' actions were outrageous or conscience-shocking. Accordingly, Defendants' motion for summary judgment on Plaintiffs' substantive due process claim is granted.

### 2.  *First Amendment Retaliation*

In support of their First Amendment retaliation claim, Plaintiffs contend that Defendants maliciously filed a knowingly false complaint against Plaintiffs to CPS in retaliation for Plaintiffs' communications to Wiles, Sharoff and Eikszta addressing complaints and concerns regarding the treatment of, and failure to provide a safe learning environment for, Plaintiffs' children. Plaintiffs further argue that Defendants retaliated against them for the filing of the Notice of Claim in this action by facilitating an occupational therapy evaluation of IG, which was conducted outside the presence of Plaintiffs. Defendants argue that they are entitled to summary judgment on Plaintiffs' First Amendment retaliation claim because (1) there was no chilling of the exercise of Plaintiffs' speech rights, and (2) the impetus for the CPS report was reasonable cause to suspect child abuse or neglect, and therefore, the report was not made in retaliation for the exercise of

13

Plaintiffs' speech.

As a general rule, private citizens claiming First Amendment retaliation against a public official must establish "actual chilling" of their speech. Zherka v. Amicone, 634 F.3d 642, 645 (2d Cir. 2011). However, in limited circumstances, other forms of harm have been accepted in place of the actual chilling requirement. See id. In Cox, where, similar to this case, the plaintiffs asserted a First Amendment retaliation claim against a school district and its employee, the Second Circuit did not require plaintiffs to establish the "actual chilling" of speech. There the court stated that in order to prove a First Amendment retaliation claim, the plaintiff must establish "(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." Cox, 2011 WL 3631971, at *3 (citing Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir.2003); Kuck v. Danaher, 600 F.3d 159, 168 (2d Cir.2010)). Accordingly, Plaintiffs here need not establish an actual chilling of their speech in order to prevail on their First Amendment retaliation claim.

While Defendants do not contest that Plaintiffs' speech is protected by the First Amendment, they do argue that Plaintiffs' First Amendment retaliation claim must fail because they cannot prove the "adverse action" element, which Plaintiffs contend is the alleged malicious filing of a materially false CPS report. Defendants argue that because the impetus of that report was reasonable cause to suspect child abuse or neglect, its filing is not an "adverse action" for purposes of a First Amendment retaliation claim. Plaintiffs counter that the substantive content of the CPS complaint was materially false and that the temporal proximity of the report to Plaintiffs' complaints to the School District establish retaliatory intent.

14

Under New York Social Services Law, school officials are "mandated reporters," such that they have an affirmative obligation to report child abuse or neglect.  See N.Y. SOC. SERV. LAW §§ 413(1), 416 (McKinney 2009).  See also DeLeon v. Putnam Valley Bd. of Educ., 228 F.R.D. 213, 216 (S.D.N.Y. 2005).  New York confers immunity from civil and criminal liability whenever persons who report suspected child abuse do so in good faith, and it exposes them to criminal and civil liability whenever they willfully fail to do so.  See N.Y. SOC. SERV. LAW § 419 ("section 419").  Courts must afford "unusual deference" to the actions of persons obligated to report and investigate child abuse or neglect, and should find that such actions pass constitutional muster where there is a reasonable basis for the report or investigation.  See Cox, 2011 WL 3631971, at *5; Kia P. v. McIntyre, 235 F.3d 749, 758-759 (2d Cir. 2000).

Against this backdrop, the court finds, as a matter of law, that the factual record does not establish a constitutional violation by Defendants.  Defendants have identified evidence in the record to support the conclusion that reasonable cause existed for the content of the CPS report, and Plaintiffs have failed to identify evidence which would raise a question of fact as to whether the information in the report was, as they allege, materially false.

To be sure, the exact language of the call narrative cannot be attributed to the caller because it is prepared by the CPS worker who fielded the call.  See Cox v. Warwick Valley Cent. Sch. Dist., No. 7:07-cv-10682, 2010 WL 6501655, at *13 (S.D.N.Y. Aug. 16, 2010) (aff'd, — F.3d —, 2011 WL 3631971(2d Cir. Aug. 17, 2011)).  See also N.Y. SOC. SERV. LAW § 415 (McKinney 2009); N.Y. COMP. CODES. R. & REGS. tit. 18 § 432.2 (2011).  However, even assuming the caller

15

reported verbatim what was recorded in the narrative, the evidence of record does not support a conclusion that the report was materially false.  It is undisputed that Plaintiffs, one or both of them, discussed sexual issues regarding one or both of the twins with several of the staff and administration of the School District, including several of the individual defendants, regarding the twins' history of sexual abuse, masturbation and self mutilation.  Also, it is undisputed that Mrs. Oglesby conveyed to Eikszta that Mr. Oglesby installed video cameras in Plaintiffs' home in order to monitor the twins' activities and that Mrs. Oglesby told Leland that she was examining IG's vagina.

In addition, it is undisputed that, other than a few instances of inappropriate conduct, IG successfully completed kindergarten and first grade, and it was not until second grade, and the incident with the caulking gun, that she began to deteriorate.  Taken as a whole, based on the entirety of the record, no reasonable juror could conclude that there was a lack of a reasonable basis to suspect abuse or neglect in this case.  The court sympathizes with the devastating effects that a CPS report and resulting investigation has on a family.  However, faced with the information before them, the mandated reporters in this case had the unwelcome choice of "whether to suffer [] § 1983 liability for reporting or N.Y. Soc. Serv. Law § 420 liability for not doing so."  Cox, 2011 WL 3631971, at *5.  Accordingly, Plaintiffs are unable to establish that Defendants took an adverse action against them by the filing of the CPS report.

Nor does the evidence support the second basis of Plaintiffs' retaliation claim, that Defendants retaliated against them for the filing of the Notice of Claim in this action by facilitating an occupational therapy evaluation of IG to take place outside of Plaintiffs' presence.  Sharpe testified, and Plaintiffs do not dispute, that

16

the evaluation took place outside the presence of Sharpe or Plaintiffs without Sharpe's knowledge or intention. Plaintiffs have adduced no other evidence to establish a question of fact in this regard. Therefore, Defendants are also entitled to summary judgment as to Plaintiffs' First Amendment retaliation claim against them.[2] Consequently, the court need not address the Defendants' asserted qualified immunity defense.

## *IV. Conclusion*

For the aforementioned reasons, it is hereby ORDERED that Defendants' motion summary judgment against Plaintiffs pursuant to Fed. R. Civ. P. 56, see Dkt. No. 75, is GRANTED.

Accordingly, the Clerk of the Court is directly to close this case.


IT IS SO ORDERED.

DATED:    September 21, 2011
          Syracuse, New York

_____
Neal P. McCurn
Senior U.S. District Judge

---

[2] Both of Plaintiffs' claims against the School District pursuant to Monell v. Dep't of Soc. Serv. of the City of New York, 436 U.S. 658, 694-95, 98 S.Ct. 2018, 2037-38 (1978) are necessarily dismissed as well. See Graham v. City of New York, No. 08-CV-3518, 2011 WL 3625074, at *13 (E.D.N.Y. Aug. 17, 2011) (citing Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571 (1986)).

17